Parmelee *v.* Oswego and Syracuse Railroad Co.

---

SAME TERM. *Before the same Justices.*

PARMELEE and others *vs.* THE OSWEGO and SYRACUSE RAILROAD COMPANY and others.

In the year 1841 G. and B. severally applied to the commissioners of the land office to have certain lots at Syracuse set apart to them for the manufacture of coarse salt. Such applications were granted, and resolutions were passed by the commissioners setting apart to the applicants the lands therein described, " for the purpose of erecting works thereon for the manufacture of coarse salt, pursuant to the provisions of Article 4 of Title 10 of Chapter 9 of Part 1 of the

Parmelee *v.* Oswego and Syracuse Railroad Co.

Revised Statutes." The 107th section of the article of the revised statutes referred to in the resolutions, provides that the occupant under such a resolution shall have four years within which to complete the works, but that the location *shall be void* unless the works shall have been commenced, and one tenth of the capital expended within one year; and that "the land, except such parts thereof as shall have works actually erected thereon, shall be liable to be located by any other individual or company." The 108th section enacts that any part of such location which, at the expiration of the said four years, shall not be actually occupied by manufactories, *may be again set apart by the commissioners of the land office to any other person or company, for the erection of such manufactories."* The plaintiffs had succeeded to the rights of G. and B., by assignment. A portion of the lands mentioned in the resolutions were not occupied by manufactories, within the four years; but they had been enclosed by the plaintiffs, and improved for agricultural purposes.

In 1848, the defendants, having laid the track of their road through the lands in question, under and pursuant to the provisions of the 7th section of the "act to dispose of certain vacant and unoccupied lands belonging to the Onondaga Salt Springs Reservation," &c. passed April 12, 1848, authorizing them to occupy any of the salt lands belonging to the state, for the use of the road, which should be necessary, on appraisement and payment of the value; the lands were appraised at $739,50, which sum was paid by the defendants into the treasury of the state, and letters patent were issued by the state, to the defendants, for the land taken by them. In an action of ejectment, brought by the plaintiffs for such land,

*Held* 1. That the resolutions of the commissioners of the land office were not *leases*, but *agreements*; and that regarding them as agreements, they were executory when made, and only became executed *pro tanto*, at the expiration of the four years, so far as the erections had extended over the lands set apart. That as to all the unoccupied lands, such agreements were at all times *executory and permissive* only, or were *licenses* to occupy the lands of the state for a certain purpose, provided certain conditions were complied with. And that as to so much of the lands as the occupant had covered with erections, at the end of four years, the resolutions became a *continuing license*; but as to the residue, the license ceased and became inoperative.

2. That it was a condition precedent that the right should be exercised within the prescribed time, if at all; and that the right not having been so exercised, all interest under the resolutions ceased. And that the plaintiffs' occupation of the premises for agricultural purposes was a violation of the spirit of the resolutions, and an unlawful usurpation of the property of the state.

3. That the plaintiffs were entitled to be relieved in equity from the forfeiture.

4. That the defendants having a title derived from the state, by letters patent executed by the proper authorities, even though it were void, the plaintiffs, who were mere strangers and intruders, could not set up its want of validity, in an action of ejectment. And that the right of the defendants was paramount to that derived by the plaintiffs from their prior unlawful possession.

5. That the validity of such patent could only be controverted in a direct proceed-

Parmelee *v.* Oswego and Syracuse Railroad Co.

ing to avoid it, by scire facias, or in chancery; and could not be attacked in a collateral proceeding.

A distinction exists, between a party claiming the possession of land without any color of title, and one who has established a title in himself, whose rights are attempted to be subverted through a conveyence emanating from the officers of the government, under the provision of a statute.

In the latter case, the party relying on such a conveyance, must prove all the previous steps necessary to confer on the officer the power of sale. But as against a party who shows no color of right in himself, and even when he shows a title from the state, of a junior date to that conveyed by letters patent, such letters, under the seal of the state, are conclusive until they have been repealed.

It is only when the letters patent are *void on their face*, by reason of being issued contrary to law, or where the grant is of an estate contrary to law—as against the prohibition of a statute—that such grant will be held void in a collateral proceeding.

By the act of April 12, 1848, authorizing the commissioners of the land office to lay out into lots, and sell " such portions of the Onondaga salt springs reservation as are not occupied for the manufacture of salt, *and which they shall deem unsuited for that purpose,* the commissioners are made the judges of the character of the lands; and when they have *decided* upon that question, by directing a sale of a specified portion of such lands, and a purchaser has paid his money into the treasury and received his patent, the people cannot, *in an action of* ejectment, alledge that the grant is void, without restoring *the* purchase money. Nor can third persons do it, who have no interest in the question.

In a collateral proceeding by an ejectment, the people would, under such circumstances, be estopped, by the receipt of the purchase money, and their own record of conveyance. And no private person could sustain such a suit, either in law or chancery, without restoring the money he had received. *Per* GRIDLEY, J.

Where the commissioners of the land office have directed a sale of a portion of the lands in the salt springs reservation, and a patent has been issued to the purchaser, evidence that such lands were in fact well suited for the manufacture of salt, is not admissible, to prove that the commissioners have *judged erroneously,* or *acted corruptly,* and that therefore the grant is void.

It was not the intention of the framers of the constitution, when they forbade the *sale* of lands contiguous to the salt springs, to prohibit the appropriation of such parts of them as might be necessary for public highways, canals or railroads.

An act, therefore, which provides for the taking of such portions of those lands as may be necessary for the construction of a railroad, upon the appraisal and payment of the damages to the state, occasioned thereby, is not in conflict with the constitutional prohibition of the sale of such lands.

Such an appropriation of the lands is not a sale, within the letter or spirit of the constitution.

THIS was an appeal, by the plaintiffs, from a judgment entered in favor of the defendants, upon the direction and in pursuance of a decision of Justice Pratt, before whom the cause

Parmelee *v.* Oswego and Syracuse Railroad Co.

was tried. The suit was commenced by summons and complaint, according to the code of procedure, in July, 1848; and was tried in April, 1849, before the justice, without a jury; a trial by jury being waived by the respective parties. The facts appearing in evidence upon the trial are sufficiently set forth in the opinion of GRIDLEY, J. which follows. No question was made by the plaintiffs in respect to the regularity of the organization of the railroad company, or as to the location of the line where the defendants proposed to construct their road. At the close of the evidence, the justice held and decided, as matter of law, that under the resolutions passed by the commissioners of the land office, Gere and Brewster took no right or title whatever in any of the lands embraced therein on which salt erections were not made, except upon a condition precedent that they should within four years, cover such lands with coarse salt works. That inasmuch as Gere and Brewster, or their assigns, had not, within four years from the passing of the resolutions, erected coarse salt works upon that part of the farm lots taken by the railroad company, no right or title had ever vested in Gere and Brewster, or the plaintiffs as their assigns; and consequently that the plaintiffs never had any such interest in the premises as would entitle them to maintain this suit. To this decision the plaintiffs excepted, and filed a bill of exceptions.

*Geo. F. Comstock,* for the appellants. The defendants have never acquired any right or title whatever to the premises in controversy, nor did they enter under any license or consent. They are therefore mere wrongdoers. I. The only title set up, by the defendants, is one which they claim to have acquired under the act of April 12, 1848. (*Laws of* 1848, *p.* 466.) Their title under that act is good for nothing, because, II. The act itself, by a fair and sound construction, applies only to such lands as are unsuited to the manufacture of salt; whereas the lands in question are proved to have been well adapted to that purpose. The act also requires a determination to be made by the commissioners of the land office, that the lands to be sold under its provisions are unsuited to that purpose; and no such determi-

Parmelee *v.* Oswego and Syracuse Railroad Co.

nation was ever made. III: But if the 7th section of the act (under which the defendants claim) applies to lands which are suited to the manufacture of salt, then it is unconstitutional and void. (1.) Such lands must be sold by "authority of law," (*Const. art.* 7, § 7,) and the law must prescribe the lands to be sold. The legislature cannot delegate the power to select such lands as shall be sold. (2.) The legislature itself has no power to surrender up such lands to any person or corporation, except by a sale. But section 7 of the act does not provide for a sale. If it does, then, as we have already seen, such sale could not, under the other provisions of the act, be made until the commissioners should determine that the lands were *unsuited* to the manufacture of salt. (3.) The sale must be under "the direction of the commissioners of the land office." No such thing is provided for in the 7th section of the act. As the defendants are obliged to construe this section, the commissioners have no sort of agency in the matter. The commissioners, under that section, neither make nor direct any sale. If it be a sale at all, the act itself makes it, without any interference on the part of the commissioners. (4.) The sale can only be made "for the purpose of investing the moneys arising therefrom, in other lands alike convenient." But this act does not provide that the moneys arising under the 7th section, shall be invested in other lands. They are simply to be paid into the treasury of the state. (5.) By such sale the aggregate quantity of lands suited to the manufacture of salt "*must not be diminished.*" But by the operation of this act, the quantity is certainly diminished for an indefinite time, (until other lands are purchased,) and may be for ever. The act contains no provision that the quantity shall be maintained; and yet a law, in order to be constitutional, must secure this beyond all possible contingency. (6.) The act makes no provision for compensation to the owners of the land in question, or persons having an interest therein; and it is for that reason void. (*Const. art.* 1, §§ 6, 7.) IV. The act in question was passed April 12, 1848, and took effect in 20 days. But on the 15th of April, appraisers were appointed under the act to appraise these lands. Their appointment, and all their

Parmelee *v.* Oswego and Syracuse Railroad Co.

proceedings, were therefore void, and this alone is fatal to the defendants' title.   V.  The patent issued to the railroad company is of no avail to them.   This was issued solely under the authority of the act aforesaid, and that act neither required nor authorized any patent; and if the act had authorized it, then the patent would be liable to all the objections already considered.   VI.  The defendants, therefore, having no sort of right, or title to the lands in question; and having entered as mere wrongdoers, the plaintiffs may maintain this suit to recover from them the possession of such lands.   Nor can the defendants set up a want of title in them.   They were in the full and peaceable possession of the lands, under claim of title, at the time of the unauthorized entry, and this entitles them to sustain the action. (1 *Cowen*, 613.   5 *John.* 202.   9 *Wend.* 223.   15 *Id.* 171.   11 *John.* 504.   7 *Cowen*, 637.)   The court below erred in saying that the act of 1848 enured *as a license* to the defendants, so as to relieve them from the operation of the principle last stated. VII.  But the plaintiffs had more than a mere possession.  They had the *right of possession* under the leases from the commissioners of the land office.   (1.)  Those leases passed a present interest, and not an estate to vest *in futuro*, upon the performance of a condition *precedent*, as supposed by his Honor Judge Pratt.   (1 *R. S.* 267, 593, 94, 95.   6 *Pick.* 528.   7 *Conn.* 528. 3 *Pet.* 346.  1 *T. R.* 638, 645.  18 *Conn.* 535.   10 *Pick.* 507.   12 *Shep.* (25 *Maine*) *Rep.* 201, 525.   6 *Serg. & Rawle*, 384.) (2.) If the leases are upon a condition of any sort, it is a *condition subsequent*, and although that may be broken, the defendants have no right to take advantage of the breach.   (*Taylor's Land. and Ten.* 59, 60, 133, 134, 138.   9 *Paige*, 127.   6 *B. & Cress.* 519.   4 *Kent's Com.* 126, 7.   4 *Gill & John.* 121.   2 *N. Hamp. Rep.* 120.   9 *Mass.* 501.   4 *Taunt.* 23.   *Shep. Touch.* 149.) (3.)  The mode of defeating the estate granted by the leases, is specially pointed out by the statute.   *The commissioners of the land office may set apart the lands to any other person*, and this is the only mode of defeating it, without the action of the legislature.   (4.)  The special circumstances of the case prevent a

Parmelee *v.* Oswego and Syracuse Railroad Co.

forfeiture, even if there is a condition in the leases. The facts proved are equivalent to a performance of such condition. (1 *T. R.* 738, 645.　2 *Bibb*, 218.　2 *Peters*, 102.　2 *Conn.* 494.)

*John Ruger & J. L. Bagg*, for the respondents. I. Although by the complaint, damages are claimed on account of the defendants' entry on the land, yet the plaintiffs can not, under any circumstances, recover such damages in this suit, as the proofs show that the railroad company took possession and graded the track in the whole, or in part, in the fall of 1847. But the Messrs. Kenyon (two of the plaintiffs) did not acquire any interest in the premises, until May, 1848.

II. The action, as stated in the opinion of the judge, is in the nature of ejectment, and all the rules of evidence and principles, common to ejectment, are applicable to this case. The general and universal rule in ejectment, is that the plaintiff must recover on the strength of his own title, and not on the weakness of his adversary's. (*Adams on Eject.* 30.　16 *John. R.* 200.　9 *Cowen*, 86.　4 *John.* 150.) Even a forcible entry on the premises would not estop the defendants from asserting an independent right to retain the possession. The plaintiffs are bound to show such a right or interest in the land as would enable them to maintain ejectment against one entering directly under authority from the state. Or in other words, if the superintendent of the Onondaga salt springs, who is by statute deemed to be in possession of all the state lands in the salt reservation, (*see* 1 *Rev.* 1*st ed.* 257, §§ 27, 28,) should enter on the lands in behalf of the state—could the plaintiffs in the case here presented, have maintained trespass or ejectment on such entry? If the plaintiffs had not such an interest or estate in the land as to have authorized a recovery of the possession after forfeiture, then the defendants claim that their entry on the lands was of such a character as to enable them to set up in defence, title to the land in the state, even if they have not acquired title under the provision of the act of 12th of April, 1848, or the act of March 27, 1848, or otherwise. By the act of 12th April, 1848, the defendants were authorized to *occupy any of the salt*

*lands belonging to the state,* for the use of the road, which shall be necessary, on appraisement and payment of the appraised value.   If these lands did then, in fact belong to the state, and if the state had a right to their possession at any time, it follows that if the defendants did, under the law of 12th April, 1848, take possession before the appraisement, *the state is the only party to complain of such entry.*   But this entry by the defendants has been assented to and sanctioned by the state, by *their receipt* of the appraised value of the land; and the defendants, even if they have not acquired a valid title, have a right to insist that they are not trespassers, or mere intruders, but are in possession under a license from the true owners.   If such is the true position of the defendants, they have a valid possession of the land, so far as it relates to the plaintiffs; and may, if it is necessary, protect themselves in this action, by setting up title to the land in the state, under the authority of the cases above cited.

III.  The defendants have acquired a valid title to the land from the state by virtue of the proceedings under the act of the 12th April, 1848, as well as under the provision of the general railroad act of March 27th, 1848.   (*Laws of* 1848, *pp.* 232, 237, §§ 24, 46.)   (1st.)  The 7th section of act of 12th April, 1848, has no application to the question whether the lands which the railroad company may require for their track, are suitable or otherwise for the manufacture of coarse salt.   (*See Laws of* 1848, *p.* 468, § 7.)   Although the general object of the act is to provide for the sale of the lands which may not be suitable for this purpose, yet the 7th section is an independent provision, and was intended to give the right of way to railroads over *any salt lands* which may be *necessary* for the track of said road. That such was the design of the legislature is evident, not only from the language of the 7th section, but from the nature of the case itself.   There is certainly no provision in the present constitution prohibiting the sale of any salt lands, whether they may be suitable and necessary for salt making purposes or otherwise.   Although a prohibition existed in the constitution of 1821, prohibiting the sale of lands contiguous to the salt springs

which might be necessary and convenient for the use of said
springs, yet by the new one the authority is expressly given to
sell such contiguous lands, "*by authority of law, under the di-
rection of the commissioners of the land office, for the purpose
of investing the moneys arising therefrom in other lands alike
convenient; but by such sale and purchase the aggregate
quantity of land shall not be diminished.*" It would be a very
difficult matter to show how this provision of the constitution
could be carried out in any manner, by giving it the strict and
technical construction, which the plaintiffs do in this case. Any
of the lands, however contiguous, convenient, or necessary, for
the use of the salt springs may be sold. But it is contended by
the appellants that *before such sale,* or *simultaneous therewith,*
an equal quantity at least shall be purchased, so that the aggre-
gate shall not be diminished. This is clearly not the true con-
struction of the constitution; for the constitution clearly implies
that such contiguous land shall be sold and paid for, before other
lands are purchased; as this clause expressly provides that such
purchase shall be made with the moneys *arising from the sale;*
so that there must be at all events, a period of time after the sale,
before the title to other lands can be acquired. But the section
becomes inoperative and void for uncertainty, and impossible of
execution, if the commissioners of the land office are precluded
from selling such contiguous land until they have purchased an
equal amount elsewhere; as there is no provision for paying for
the land purchased, except out of the avails of the sales of such
contiguous lands; as the *moneys arising from such sale* are to
be invested in purchasing other lands, alike convenient. But
it is obvious that the various sections of the act of 12th April,
1848, except the 7th section, have no reference to the land, the
sale of which is provided for in the 7th section of article 7 of
the constitution. This clause in the constitution does not pro-
hibit the sale of any lands: it merely provides as to the manner
and purpose of selling such lands as are contiguous to, and ne-
cessary and convenient for the use of the salt springs. The
great object of the act of 1848 is to sell the lands unsuitable for
the manufacture of salt; and the provisions of that act requir-

ing the avails to be invested in other lands, are not necessary, so far as the constitution is concerned, in any manner; for no restrictions are imposed by the constitution on the sale of unsuitable lands, they being in the same condition of other state lands, and may be sold at any time, under authority of law. (2.) But the defendants insist, that by carrying out the provisions of the 7th section of the act of 1848, in favor of the railroad company, even though the constitution had forbidden the sale of all lands, there would be no violation of such supposed prohibition of the constitution, for the reason that this is not a sale whereby the railroad company may acquire an absolute estate in fee in the land. This 7th section merely authorizes the temporary *use of the land for a public purpose, for a definite period of time,* the title remaining in the state; all the interest the railroad company acquired is the right to use the land for their track during the *continuance of the charter of the company.* (*See Charter Syracuse and Oswego R. R. Co. Laws of* 1839, 254, *and Session Laws of* 1836, 319; *General Railroad act, Laws of* 1848, 228, §§ 24, 46.) If the construction of the constitution as contended for by the plaintiffs, is to prevail, it would follow that commissioners of highways would have no authority to lay out a public road through any of these lands; nor would the state be authorized to make a canal through them, as such use would diminish the aggregate quantity of salt lands. (3.) It is claimed by the plaintiffs that the railroad company has not acquired any valid right to these lands under the 7th section of the act of 1848, for the reason that the appraisers were appointed before the act took effect: rendering all the proceedings void. There are two answers to this objection. First. The commissioners of the land office have ratified and confirmed the acts of the appraisers, so far as the defendants are concerned, by receiving, June 3d, 1848, from defendants, the appraised value of the land so taken, and by ordering the issuing of a patent for the land, on the 5th of October, 1848. Second. Even if any informality in the proceedings of the commissioners under the act of April 12, 1848, would have the effect of rendering the defendants' title voidable at the election of the state; its validity

Parmelee v. Oswego and Syracuse Railroad Co.

can not be questioned by the plaintiffs who have no such estate or interest in the land as would authorize them to make this objection. Their possession could be nothing more than a mere naked one without right as against the state or those who take possession under the authority or license of the state. (4.) But the defendants claimed, that if they derived no right under the 7th section of the act of April 12, 1848, the acceptance of the sum appraised, by the state, as appears by the receipt of such sum into the treasury, may be regarded as an agreement between the commissioners of the land office and the defendants, as to the amount of compensation to which the state was entitled for the land taken ; and that the defendants have acquired a legal and valid interest in the land, during the continuance of their charter, according to the provisions of the 24th and 46th sections of the general railroad act. (*Laws of* 1848, *p.* 232, §§ 24, 46.)

IV. The act of the commissioners, in setting apart the land in question to the plaintiffs, gave them no right to use the land, except upon the *condition* that they should *within four years thereafter* cover it with salt erections. This was a condition *precedent*, and no title vested in the plaintiffs, to any lands upon which such erections were not made within the time limited. Such is the policy of the law. (1 *R. S.* 257, § 107, 108. 2 *Black. Com.* 157, *Phil. ed.* 1822. 4 *Kent's Com.* 124, 125, *2d ed. Coke's Litt.* 206.) In 2 *Black. Com.* 157, *Phil. ed.* 1822, it is said, "if a condition be precedent, or to be performed before the estate vests, the grantee has no estate until the condition be performed, whether such condition be void or otherwise." In 4 *Kent's Com.* 125, 134, *2d ed.* it is said, "Whether a condition be precedent or subsequent, is matter of construction, and depends upon the intention of the party creating the estate." (*See also* 1 *T. R.* 695 ; 2 *Bos. & Pull.* 295, 297; 3 *Peters' U. S. R.* 346.) "If the condition be precedent, the estate can not be claimed or vested until the condition be literally performed. And even a court of chancery will never vest an estate when by reason of a condition precedent, it will not

Parmelee *v.* Oswego and Syracuse Railroad Co.

vest at law." (4 *Kent's Com.* 125. *Popham* v. *Bampfield*, 1 *Vern.* 83.)

V. The state, by not having at the end of four years, dispossessed the plaintiffs, lost no rights thereby, nor did the plaintiffs acquire any rights thereby. No laches can be imputed to the state. Nothing short of a strict performance of the condition upon which the lands were set apart, could enable the plaintiffs to hold possession against the state, or any person acquiring rights from the state, or having a license to enter from the state. As to the effect of waiver and acquiescence, see the following authorities, 1 *John. Cas.* 125; 3 *Taunton*, 78; 4 *Id.* 735; 12 *Moore*, 37. In 3d Taunton, the court say, the act by which the forfeiture is waived must amount to the affirmance of the tenancy, or a recognition of its continuance. It is not enough that the lessor knows of the breach, without availing himself of his right of re-entry. Where a lessee carried on a trade by which his lease was forfeited, it was held that the landlord had not waived his right to enter for the forfeiture, by lying by and witnessing the act for six years. On the same principle, the landlord would not waive the non-performance of a condition by silence. Neither can the continued possession of the plaintiffs, after the expiration of the four years, be construed by reason of the silence or acquiescence of the state, as giving the plaintiffs the right to hold these lands from year to year or as a new setting apart of these lands to them, for salt purposes. (6 *B. & Cres.* 519. 9 *D. & R.* 536. 2 *Har. Dig.* 3599. 4 *Taunton*, 735. 6 *Com. Law R.* 462.) Besides, the plaintiffs can gain nothing by any neglect or laches on the part of the state. (*Finley's Land. & Ten.* 384.) In *Coke Litt.* 57, it is said, "no man can ever be tenant at sufferance against the king, to whom no laches or *neglect* in not entering or ousting the tenant, is ever imputed by law—but his tenant in holding over, is considered as an absolute intruder."

VI. The act of the state in permitting the railroad company to pass over the land in question, was notice to the plaintiffs of the election of the state to take advantage of the non-performance of the condition, even if any notice was necessary. (*Doe*

v. *Hawks*, 2 *East*, 481, *cited in Chambers on Leases*, 184.) In the last case, a lease for years was made if the lessee, his executors or administrators should so long inhabit and dwell on the farm demised, and actually occupy the lands, and not let or assign over; the tenant became a bankrupt and his assignees sold the premises. It was held that the lease was void without entry, because this was not a case of forfeiture, but the actual occupation was annexed as a condition of the lease. So in this case the erection of works upon the land within four years, was the condition on which the plaintiffs were to hold the land.

VII. Even if this is to be regarded as a condition subsequent, yet the performance of the condition within four years would be necessary, to enable the plaintiffs to hold possession of the lands in question as against the state or these defendants, and the plaintiffs would have no such right or interest as would enable them to maintain this suit; and this view of the case would sustain all that is material in the opinion of Justice Pratt in giving the decision in this action. For all that is material in such opinion, is that the plaintiffs had no such interest as would enable them to maintain this suit. It can not be material whether the plaintiffs ever acquired any vested right, or having acquired, lost it by non-performance, so long as they had no right to hold these lands against the state or these defendants. Even equitable considerations insisted upon by the plaintiffs in their complaint can not avail them. (1 *Russ. & M.* 506. 2 *Sto. Eq. Juris.* §§ 1321, 22, 23. *Hill* v. *Barclay*, 16 *Ves.* 403.) Where any penalty or forfeiture is imposed by statute, for the doing or omission of a certain act, then courts of equity will not interfere to mitigate the penalty or forfeiture incurred; for it would be in contravention of the direct expression of the legislative will. (2 *Story's Eq. Jur.* § 1326. 1 *Strange*, 447. 1 *Ball & Beatty*, 373.)

VIII. The testimony given by the plaintiffs, in regard to their intention to erect salt works on these lands after the four years, and the reasons for not doing so, were duly objected to by the defendants, and is clearly irrelevant and improper, as the only object of such testimony was to establish an equitable title in

the plaintiffs; and this, even if it was shown by legal testimony, would not authorize an action of ejectment. (*Adams on Eject.* 32. 9 *Cowen*, 88. 9 *John.* 60. 2 *Id.* 226.) See also in relation to allegations and evidence of intentions, 3 *Howard's Sp. T. Rep.* 358.

IX. The application made by the plaintiffs, or those under whom they claim, to the commissioners of the land office, in January, 1848, to have these lands again set apart to them, is an admission of a want of title on their part, and of a forfeiture of all estate in the premises, if they ever had any estate.

X. The law incorporating this railroad company being a public act, and passed for a public benefit, confers upon the corporators the right to pass over any land of the state, if necessary to the purposes of the road ; and no special law is required to confer this right. The rights of the company to take the lands of others for the use of the road, is founded on the assumption, that the land is in law taken by the state through its agent the railroad company. (*Beekman* v. *Saratoga Railroad Co.* 3 *Paige*, 45.) It is averred in the answer of the defendants that the lands in question taken by the railroad company were necessary to be taken for their use; and that fact is not denied in the reply.

XI. The grant by the state to the Oswego and Syracuse Railroad Company, to construct a road from Syracuse to Oswego, passed the right to the company, to cross any lands of the state, which would be a necessary incident to the enjoyment of the grant ; because the rule of law is that the granting of a thing, passes the incidents necessary to the enjoyment thereof.

XII. The state may sell any of their lands or property in any manner the legislature shall direct, unless they are prohibited by the constitution. The constitution does not prohibit the sale of any lands, salt or other kinds. Section 7, article 7 of the new constitution merely prescribes the modes and purpose of selling lands " contiguous to, and necessary and convenient for the use of the salt springs," and says, " that such contiguous, necessary and convenient lands for the use of said springs, may be sold by the authority of law, under the direction of the commissioners of the land office, for the purpose of investing the

Parmelee *v.* Oswego and Syracuse Railroad Co.

moneys arising therefrom in other lands alike convenient, but by such sale and purchase, the aggregate quantity of these lands [meaning lands contiguous, necessary and convenient] shall not be diminished." But this does not prohibit the sale, or prescribe the mode and purpose of the sale, of any other lands, salt or otherwise. If the lands in question are not averred or proved to be such as are mentioned in the 7th section of article 7 of new constitution, that is, to be "lands contiguous to the salt springs, and necessary and convenient for the use of such springs," then it is clear that the state may sell them in any way and for any purpose, the same as any other state lands or property, so far as the constitution is concerned. The lands in question are not averred in the complaint, nor is there any proof showing that they are contiguous or necessary, or convenient to the salt springs. And in fact, the lands in question do not have any of the above qualities. The plaintiffs in their complaint, only alledge that the lands in question "are suitable for salt purposes." This might be said of half the lands in Onondaga county. The legislature being under no prohibition by the constitution, even as to the mode and purpose of selling lands, not contiguous to the salt springs, had the right to sell the lands in question, to any person or corporation, and therefore had the right to enact sections 24 and 46, general railroad act of March 27th, 1848, and 7th section of the act of 12th April, 1848. (*See Sess. Laws* 1848, *pp.* 232, 237, 468.) But even if it had been averred and proved that the lands in question were contiguous, necessary and convenient for the use of the salt springs, yet we insist that the moneys arising from the sale of the lands in question, to the railroad company, will be presumed to have been invested in other lands alike convenient for the use of said springs, because public officers are presumed to have done their duty, in the absence of proof to the contrary. So that if the plaintiffs intended to insist that the moneys arising from the sale to the railroad company, had been misapplied, they should have averred and proved the same. But as to this point there is no averment and no proof. Again, we say that if the commissioners of the land office had the right to sell these lands for any pur-

pose, it will, in the absence of proof be presumed that they sold for such purpose, and applied the moneys arising therefrom according to the requirements of the constitution. From the act of selling to, receiving pay from, and giving a patent to said railroad company, for the lands in question, in the absence of proof, it will be presumed that all the prerequisites to render that act of the commissioners valid took place. And we insist, that the title of the railroad company would be good, if the commissioners of the land office had a right to sell for any purpose; because we claim we are not to look after state officers, to see that they do their duty. If they violate their duty they will be punished by impeachment or other appropriate punishment, but the company who pay their money will not lose their land. If the plaintiffs ever acquired any rights, they have lost the same by using them for purposes other than for salt erections; and in such use were mere trespassers and intruders.

XIII. A patent of lands by the state, shall be presumed to have issued regularly, and if it be not void on its face, can not be avoided collaterally in a suit between individuals, unless it issued without authority, or against the prohibition of a statute. (*Jackson* v. *Marsh,* 6 *Cowen,* 281.) Thus, where a patent issued in 1823, for lands, which were occupied, and improved to the value of $25, on the 17th of February, 1809, it was held that it should be presumed, that satisfactory proof was produced to the commissioners of the land office, that the occupant had been satisfied for his improvements, previous to the date of the patent, pursuant to the statute. (1 *R. L.* 396, 297, § 17.)

XIV. The location and setting apart to the plaintiffs or to those under whom they claim, was not a lease, nor had it the character of a lease, and none of the consequences result from it, which would result from a lease.

*By the Court,* GRIDLEY, J. This action was brought to recover damages, for the alledged trespass committed by the defendants in excavating and laying the track of the Oswego and Syracuse railroad, through lands claimed by the plaintiffs; and also to recover the possession of the said lands. It appears that

two of the plaintiffs, Robert C. and Sands N. Kenyon, acquired their interest in the premises in question on the 9th of May, 1848. And there is no evidence in the bill of exceptions, that any acts of the defendants charged as trespasses, were committed after that time. It is stated that the excavation was completed before the month of June; but whether it was or was not completed before the 9th of May, does not appear. Unless it was proved that some of the acts were committed after the Kenyons assigned their title to the premises, that part of the action which seeks to recover damages, must fail. And so I understand the learned justice who tried this cause, without a jury, to have found, as *a question of fact.* I also understood the counsel of the plaintiffs, on the argument, to abandon this part of the action, and to concede that the only question remaining for the decision of this court, was that which involves the title and possessory right to the premises in question; in other words, the ordinary issue, in an action of ejectment.

I. Under this aspect of the case, the first inquiry is, what right the plaintiffs have established to the lands in controversy. Those lands, are that part of lots 54, 55 and 56, in the Onondaga salt springs reservation, lying west of the city of Syracuse, which is occupied by the track of the defendants' railroad. They were the property of the state; and whatever interest the plaintiffs had in them, rests on the following state of facts.

In the year 1841, one Robert Gere, applied to the commissioners of the land office, to have farm lots Nos. 54 and 55 set apart to him for the manufacture of coarse salt; and one Samuel Brewster, at about the same time, applied to have farm lot No. 56 set apart to him for the same purpose; which applications were respectively granted; and the plaintiffs have succeeded by assignment to the rights of the original applicants. Those rights, such as they are, were assured to the applicants by resolutions of the canal board, of which the following in the case of Gere, as to all its substantial provisions, is a copy. "Resolved that the said application be granted in part, and that the land therein specifically described, excepting therefrom the parcel, &c. and excepting also the parts of streets, &c. be and the same,

Parmelee *v.* Oswego and Syracuse Railroad Co.

that is to say, farm lots No. 54 and 55, are hereby set apart to the said Robert Gere, for the purpose of erecting works thereon for the manufacture of coarse salt, pursuant to the provisions of article 4 of title 10 of chapter 9 of part 1 of the revised statutes." Sections 104, 105 and 106, (1 *R. S.* 267,) provide for the application setting forth the amount of capital proposed to be invested in the works, and for the setting apart of the land by the commissioners; and the two following sections declare the rights of the occupants under the resolutions. By the 107th section, it is provided that the occupant shall have four years within which to complete the works, but that the location *shall be void* unless the works shall have been commenced and one-tenth of the capital expended within one year; " and the land, except such parts thereof as shall have works actually erected thereon, *shall be liable to be located by any other individual or company.*" The 108th section enacts that "any part of such location, which at the expiration of the said four years shall *not be actually occupied by manufactories,* pursuant to the intention of the original location, *may be again set apart by the commissioners of the land office, to any other person or company, for the erection of such manufactories.*" The question involving the rights of the plaintiffs, arises under the provisions of the last section. All the lands embraced in the complaint in this action, and a considerable part of the residue of the three farm lots, are still vacant; no works having been erected on them, notwithstanding the four years had elapsed long before the defendants took possession of the premises. The plaintiffs enclosed these vacant lands, and improved them for agricultural purposes. And this, their counsel insists, they had a right to do, upon the ground that they hold these lands under a title, analogous to that created by a conveyance, subject to a condition subsequent, liable to be defeated only by the concurrence of two events; first, the failure to cover the land with erections within four years, and secondly, the actual setting of them apart to another applicant. To this conclusion we can not assent; and we will briefly state the grounds of our opinion.

1st. Conceding for the argument's sake, that we are to regard

Parmelee *v.* Oswego and Syracuse Railroad Co.

the resolution of the commissioners of the land office as a lease, we think that the condition to erect works within four years, on the lands set apart for that purpose, was *precedent* and not *subsequent*, as to all such lands as were not occupied within the prescribed period. It is laid down by Chancellor Kent, (4 *Kent's Com.* 124,) that there are no technical words to distinguish between conditions precedent and subsequent; and that whether they be the one or the other, is matter of construction, and depends *upon the intention of the party creating the estate.* None of the cases cited by the plaintiffs' counsel are in principle like the one under consideration. In the case of *Merrill* v. *Emery,* (10 *Pick.* 507,) the money and family stores, were certainly not intended to be kept till the granddaughter's education was completed, and therefore there could be no pretence for holding the latter to be a condition precedent. So too, in *Stark* v. *Smiley,* (12 *Shep.* 201.) Where the devise contemplated the entering upon the estate and its enjoyment, and where certain provisions for other persons were to be derived from the estate; no doubt could exist that the condition on which it was to depend, was subsequent and not precedent. Again; in *Manrick* v. *Andrews,* (12 *Shep.* 525,) where an estate was devised on condition of supporting the testator's mother, the intention was clear that the estate was to vest immediately, subject to forfeiture by a breach of the condition. Equally clear was the intention of the parties in the case of *Hamilton* v. *Elliott,* (5 *S. & Raw.* 375.) The only other case referred to is that of *Hayden* v. *Stoughton,* (5 *Pick.* 528,) where land was devised to a town for the building a school house, provided it was built 100 rods from the meeting house. In that case it was properly held that the town had a reasonable time within which to build the school house, and that 20 years was an unreasonable time, and so the condition was broken. In all these cases, and many more which are cited by Chancellor Kent, the intention was manifest, either by positive provision or clear implication, that the estate should vest immediately, subject to be defeated by the breach of the condition annexed. But the case we are considering more nearly resembles *Wells* v. *Smith,* decided in 2 Edwards' Ch.

Rep. 78, and affirmed by the chancellor in 7 Paige, 22. That was a contract for the sale of a city lot, at a stipulated price, provided the purchaser should by a particular day build and enclose a house, or in default thereof pay $1000. It was provided that the purchaser should take possession of the premises immediately, and if he did not perform, should leave a shop, which he was to build, on the premises. He did go into possession, and expended considerable sums of money in improvements, and failed to pay the $1000 at the day, though he tendered it shortly after. It was held that he could have no relief, for the reason that his right depended, not on a condition subsequent, in which case chancery would relieve against the forfeiture, but on a condition precedent, for the breach of which neither law nor chancery furnished any relief. (*Popham* v. *Bampfield,* 1 *Vern.* 83. 19 *John.* 69. 6 *Cowen,* 627.) The case of *Wells* v. *Smith* was a much stronger case for the purchaser than is this case, for the plaintiffs. The provisions of the act, under which the right of the plaintiffs arise, are peculiar. In no event does the occupant lose the erections which he may have made, nor the right to use the land on which they stand. Now, if the land originally located were deemed to have been conveyed to him subject to a condition subsequent, he would have forfeited the entire location and all the capital expended upon it. This incident—the forfeiture of the entire estate—is characteristic of a condition subsequent. The grantor enters for condition broken, into the whole premises, and becomes seised of his first estate. (4 *Kent,* 126. *Shep. Touch. by Preston, vol.* 1, 121, 155.) And therefore conditions subsequent are not favored in law. (4 *Kent,* 129.) The absence of this distinguishing feature of this species of condition is conclusive against the plaintiffs' claim. The applicant indeed had the whole of the three lots in question set apart for his use. But for what purpose? For nothing, but to erect works thereon for the manufacture of coarse salt. He had no right to enter upon and occupy the premises for any other purpose. And his right to do so for that purpose was limited to four years. Time was here made the essence of the contract, (if the resolution is to be deemed a con-

tract,) precisely as it was in the case of *Wells* v. *Smith.* Regarding the resolution as an agreement, it was executory when made, and only became executed, *pro tanto,* at the expiration of the four years, so far as the erections had extended on the lands set apart. As to all the unoccupied lands, it was at all times *executory* and *permissive only.* And at the end of the four years, all right to extend the occupation under the resolution ceased, by the very terms of it. It was a condition precedent that the right should be exercised within the prescribed time, if at all, and not having been so exercised, all right under it ceased ; and the very occupation of the premises, for agricultural purposes, was a violation of the spirit of the resolution, and an unlawful usurpation of the property of the state.

2dly. If it be conceded that the resolution is to be construed as a lease, as the counsel contends it should be, it can not be maintained that it is a lease in *perpetuity ;* for then the people would have conveyed away an estate of inheritance ; nor can it be claimed that the applicant took an estate for life ; for that would invest him with the legal title and all the attributes of a freehold estate. If a lease at all, therefore, it must be *quasi* a lease for years. In that event it will be immaterial whether the condition be subsequent or not ; for in such case the estate ceases, absolutely, as soon as the condition is broken. Speaking of conditions subsequent, Ch. Kent remarks, on the authority of *Co. Lit.* 215 *a,* and *Pennant's case,* (3 *Coke,* 64,) that " there is this further distinction to be noticed between a condition annexed to an estate for years, and one annexed to an estate of freehold ; that in the former case the estate *ipso facto* ceases as soon as the condition is broken ; whereas in the latter case, the breach of the condition does not cause the *cesser* of the estate without an entry or claim for that purpose. When the estate has *ipso facto* ceased, by operation of the condition, it can not be revived without a new grant." (4 *Kent's Com.* 128.) Under this view of the case, it is clear that the plaintiffs' right ceased with the expiration of the four years.

3dly. We think it an erroneous construction of the resolution in question to regard it as a lease at all. It is argued that this

resolution should be regarded as a lease because the commissioners never executed leases, but speak by resolution. It seems to us that this is a conclusive reason why we should not hold it to be a lease. The legislature well knew the difference between a lease and a resolution. They had already provided that lots for the manufacture of fine salt, and a certain class of lots for the manufacture of coarse salt, should be leased; and had provided very specific regulations as to the conditions of such leases. (*See* 1 *R. S.* 257, §§ 31 *to* 36, 39.) But in relation to the lands in question they merely directed the commissioners of the land office " *to set apart*" so much as they deemed reasonable to the petitioners for the purpose of manufacturing coarse salt under the conditions already stated. This is neither a conveyance nor a lease. It is merely a *license* to occupy the lands of the state for a certain purpose, provided certain conditions are complied with. As to so much of the lands thus set apart as the occupants had covered with erections at the end of four years, the resolution becomes a *continuing license ;* but as to the residue, the license, by the very terms of the resolution, ceases and becomes inoperative. It has not a single feature of a lease. It conveys no estate, nor does it purport to do so. It contains no covenants. There is no lessee, who is bound to do or not to do any act. If it were a lease, it doubtless would demise the entire location. In that event, whether the condition were held to be either precedent or subsequent, on the failure to comply with it, the applicant would lose the whole of the premises covered by the lease, with all the works erected thereon. We have already seen that under the provisions of the act no such consequence can follow. The rights of the plaintiffs under the act and the resolutions are peculiar, and *sui generis.* They have the right to *use* the lands set apart, for the *single purpose* of erecting thereon works for the manufacture of coarse salt, and for no other. And this right ceases, as to all the lands not so occupied at the expiration of four years. This we think is the fair reading of the statute and of the resolution founded on it. It follows, that the plaintiff had no legal or equitable right to occupy the land in question in this suit for any purpose what-

ever at the time when the defendants took possession of it; and that they were by consequence intruders and trespassers on the lands of the state.

4thly. It is hardly necessary to say that, if we are right in the views we have taken of the right of the plaintiffs under the act, there is no force in the suggestion that upon the facts proved the plaintiffs are entitled in equity to be relieved from the forfeiture. In addition to this, the complaint is not framed with the view of obtaining that kind of relief; there is a want of requisite parties to the action; and the facts proved are not sufficient to lay the foundation for such a claim.

II. The plaintiffs, being intruders on the public lands, claim to recover the possession of the defendants as wrongdoers, upon the ground of a prior possession. (15 *Wend.* 171. 9 *Id.* 223. 7 *Cowen,* 639.) It is true that possession is prima facie evidence of title, and a prior possession has been held sufficient evidence to entitle a party to recover in ejectment; and Justice Kent said in *Jackson* v. *Harder,* (4 *John.* 211,) that a mere intruder can not protect himself under an outstanding title in a stranger. It is difficult, however, to see what right the plaintiffs show to the possession of those premises, when the same evidence which they give to prove the existence of their prior possession also shows that it was tortious and without the shadow of any justifiable authority. However this may be, we do not think that the defendants stand in the relation of intruders or wrongdoers.

1st. They have shown a title derived from the state, by letters patent, executed by the proper authorities. Now though this patent be void, the plaintiffs, who are mere strangers and intruders, can not set up its want of validity. It was held, in the case of *Cromelin* v. *Mintur,* (9 *Ala. Rep.* 594,) that notwithstanding a patent was fraudulently obtained, or had issued in violation of law, and was therefore void, yet that a mere intruder could not set up the invalidity of the patent. And this principle we believe to be sound law. The statute makes every security tainted with usury *absolutely void;* and yet no princi-

ple is better settled than that a *stranger* can not set up that defence.

2dly. For another reason, the plaintiffs can not set up the want of validity of this patent, in this collateral way. Its validity can *only be* controverted in a direct proceeding to avoid it, by scire facias, or in chancery. And here we desire to take the distinction between a party standing in the position of the plaintiffs without any color of title, and one who has established a title in himself, whose rights are attempted to be subverted through a conveyance emanating from the officers of the government, under the provisions of a statute. We have held, in such a case, in *Varick* v. *Tallman,* (2 *Barb. S. C. Rep.* 113,) that the party relying on such a conveyance must prove all the prerequisite steps necessary to confer on the officer the power of sale. But, we say that, as against a party who shows no color of right in himself, and even when he shows a title from the state, of a junior date to that conveyed by letters patent, such letters, under the seal of the state, are conclusive, until they have been repealed. It is only where the letters patent are *void on their face,* by reason of being issued contrary to law, or when the grant is of an estate contrary to law, as against the prohibition of a statute, that such grant will be held void in a collateral proceeding. This is so laid down in 2 *Bl.* 348, 3 *Id.* 260, and was so adjudged by the supreme court of this state in *Jackson* v. *Lawton,* (10 *John.* 23,) and 6 *Cowen,* 281. In *Jackson* v. *Lawton,* it was insisted by the defendant's counsel, that a distinction existed between letters patent issued by the commissioners of the land office, in this state, and grants issued by the king, in England. It was said that the commissioners were a board instituted for a special purpose and with limited powers, and that their acts were conclusive only when done pursuant to their powers. But the court, Kent, Ch. J. delivering the opinion, held otherwise, saying that letters patent were a matter of record, and unless they were void on their face must be attacked by a direct proceeding in chancery, or by scire facias. He says, "the principle has been frequently admitted that the fraud must appear on the face of the patent, to render

it void in a court of law; and that when the fraud or other defect arises from circumstances dehors the grant, the grant is voidable only by suit." Now, there is nothing on the face of this grant to render it void.

3dly. The plaintiffs assert that the act of April 12, 1848, under a provision of which this patent was issued, applies only to lands unsuitable for the manufacture of salt, and that inasmuch as it is proved by witnesses that the lands in question were not of that character, therefore the patent is void. A conclusive answer to this objection is, that the act authorizes the laying out into lots, &c. and selling " such portions of the Onondaga salt springs reservation as are not occupied for the manufacture of salt, *and which they shall deem unsuited for that purpose.*" The commissioners are made the judges of that fact, and when they have DECIDED, by directing a sale of a given portion of this land, and a purchaser has paid his money into the treasury of the state, and received his patent, can the people alledge that the grant is void, without restoring the purchase price ? And if the people can not do this in an action of ejectment, can third persons do it who have no interest whatever in the question ? We think not. The evidence that the lands in question are in fact well suited for the manufacture of salt, was not admissible, to prove that the commissioners had *judged erroneously* or *acted corruptly,* and therefore that the grant was void. If the patent had issued under a mistake of fact, or a false suggestion, it might be repealed on a scire facias, or proceeding in chancery, wherein the purchaser could be put in *statu quo.* But in a collateral proceeding by an ejectment the people would be estopped by the receipt of the defendant's money and their own record of conveyance. No private person could sustain such a suit, either in law or chancery, without restoring the money he had received.

4thly. Another objection to the title of the defendants, under the seventh section of the act of 1848, (*Laws of* 1848, *p.* 468,) rests on the argument that the title thus obtained was in violation of the 7th section of the 7th article of the constitution of 1846. By the constitution of 1821 the legislature were prohibited from " selling or disposing of the salt springs or the lands

contiguous thereto and which might be necessary or convenient for their use." (1 *R. S.* 46, *art.* 7, § 10.) By the present constitution the *prohibition* extends only to the salt springs, but not to *the lands*, except *by implication.* The section reads as follows : " The *lands* contiguous thereto, and which may be necessary and convenient for the use of the salt springs, may be sold by authority of law, and under the direction of the commissioners of the land office, for the purpose of investing the moneys arising therefrom in other lands alike convenient ; but by such sale and purchase, the aggregate quantity of the lands shall not be diminished." Now it is fair to conclude that the power to sell, except as is authorized in this section, is by a necessary implication prohibited. There are, however, several requisites necessary to bring the taking of the land in question within the prohibition of the constitution. (1.) It must be clearly shown that the lands in question are, within the meaning of the constitution, " *contiguous* to the springs and *necessary* and convenient for the use of them." We have no means (so far as the evidence goes) of determining whether the lands in question are within the meaning and intention of the framers of the constitution. The lands in question are situated at a very considerable distance from the springs, and are not " *contiguous*" or " necessary for the use of the springs," in a different sense from a considerable territory which is now built up as a part of the city of Syracuse, and which has been sold by authority of laws passed at different times while the constitution of 1821 was in force. (1 *R. S.* 258, § 36. *Laws of* 1837, *pp.* 93, 143. *Id. of* 1829, *pp.* 345, 411.) The legislature therefore have not given so wide a construction to the descriptive words employed in the constitution as is now contended for.

(2.) If the construction of these terms should embrace the lands in question, and other lands similarly situated, then the extent of the lands, to which the prohibition extends, would include an area of several miles square. If that be so, it could never be the intention of the framers of the constitution, when they forbade the *sale* of these lands, to prohibit the appropriation of such parts of them as might be necessary for public highways;

canals or railroads. It has been decided in this state that rail-roads are so far public improvements, that the legislature may constitutionally pass acts authorizing the taking of private prop-erty necessary for their construction, and that in that respect they stand on the same footing as canals and common high-ways. (*See Beekman* v. *The Saratoga and Sch. Railroad Co.* 3 *Paige*, 45, *and Bloodgood* v. *The Mohawk and Hudson Rail-road Co.* 18 *Wend.* 9.) It may be, and probably is, a positive advantage to the manufacturers of salt, that these lands are traversed by a canal and a railroad. The facilities for sending the manufactured article to market are thereby greatly increased. An act, therefore, which provides for the taking of such portions of those lands as may be necessary for the construction of a rail-road, upon the appraisal and payment of the damages to the state occasioned thereby, is not in conflict with the constitutional prohibition of the sale of these lands. Such an appropriation of the lands is not a sale, within the letter or spirit of the consti-tution. The seventh section of the act of 1838, then, was con-stitutional. Under that act, the state, by its officers, on the 3d of June, 1848, received the appraised value of the land taken by the defendants, upon receiving the report of the appraisers who had been appointed to appraise the value of the lands sur-veyed off to the company by the state engineer and surveyor. The act gave the defendants a right to the possession of the premises so surveyed, appraised and paid for, against the plain-tiffs. It undoubtedly appears that there was some irregularity, in the proceedings of the state officers ; but none of such a de-scription as would render the rights *void* which the company obtained by the payment of their money and the receipt of it by the treasurer of the state ; especially after the subsequent ratifi-cation of those acts and the confirmation of the title of the de-fendants by the commissioners of the land office. I am not saying that the defendants have a perfect title to the land in question. It is not necessary to decide that point. But we mean to say that their title is not void by reason of its having had its origin in a violation of the constitution ; and we mean to say further, that the company has a right, as against the

state, to occupy the premises in question until such right shall be declared void in some appropriate proceeding; and that such right is paramount to the right derived from a prior unlawful possession by the plaintiffs, and cannot. be questioned by them in this suit.

For these reasons the judgment is affirmed.

----◆----

SAME TERM.   *Before the same Justices.*